KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
Tel: (914) 401-9500
Erica R. Aisner, Esq.
eaisner@kacllp.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

                                                  Chapter 11
SAMEH H. AKNOUK, DENTAL SERVICES, P.C.,   Case No. 22- 11651-mg

                                              Debtor.
----------------------------------------------------------------X

## DEBTOR'S OBJECTION TO THE APPOINTMENT
## OF A PATIENT CARE OMBUDSMAN

**TO:   THE HONORABLE MARTIN GLENN,
        CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Sameh H. Aknouk, Dental Services, P.C., the above-captioned debtor and debtor-in-possession (the "**Debtor**"), by its attorneys, Kirby Aisner & Curley LLP, as and for its Objection to the Motion (the "**Motion**") filed by the Office of the United States Trustee seeking the appointment of a patient care ombudsman ("**PCO**"), together with the supporting Declaration of Sameh Aknouk, DDS submitted herewith ("**Aknouk Declaration**") respectfully states as follows:

### PRELIMINARY STATEMENT

1.     The Debtor maintains that it is not a "health care business" within the meaning of section 101(27A) of the Bankruptcy Code and as such, the appointment of a PCO is not required. However, to the extent that the Court finds otherwise, the Debtor asserts that the appointment of a PCO is still not warranted at this time because there is no evidence that the quality of patient care and preservation of patient privacy is, or has been, compromised in any way.

**OBJECTION**

I. **A PATIENT CARE OMBUDSMAN SHOULD NOT BE APPOINTED BECAUSE THE DEBTOR IS NOT A HEALTHCARE BUSINESS**

2. The Debtor is not a healthcare business within the definition of § 101(27A) because it provides only outpatient services. Section 101(27A) provides:

> (27A) The term "health care business"-- (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--
> (i) the diagnosis or treatment of injury, deformity, or disease; and
> (ii) surgical, drug treatment, psychiatric, or obstetric care; and
> (B) includes--
> (i) any--
> (I) general or specialized hospital;
> (II) ancillary ambulatory, emergency, or surgical treatment facility;
> (III) hospice;
> (IV) home health agency; and
> (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and
> (ii) any long-term care facility, including any--
> (I) skilled nursing facility;
> (II) intermediate care facility;
> (III) assisted living facility;
> (IV) home for the aged;
> (V) domiciliary care facility; and
> (VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

11 U.S.C. § 101(27A).

3. To be considered a healthcare business under section 101(27A), a debtor must meet the requirements of both subsection (A) and subsection (B), because the subsections are connected with the conjunctive "and." *See In re Banes*, 355 B.R. at 534–35 ("Because every section of this statute is connected by the conjunctive, a health care business must meet the requirements of every subsection […]"); *See In re Saber*, 369 B.R. 631, 636 (Bankr. D. Colo. 2007) ("[…] a debtor who is a 'health care business' must meet every requirement under both subsections for a patient care

ombudsman to be appointed.").

4.     To fall under subsection (A), a healthcare business must be "primarily engaged" in offering "(i) the diagnosis or treatment of injury, deformity, or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care" to the general public. 11 U.S.C. § 101(27A) (A). Here, the Debtor likely falls under subsection (A) because it provides diagnosis and treatment of various dental afflictions as well as surgical and drug treatment for those afflictions.

5.     To fall under subsection (B), a healthcare business must be one of the type enumerated in the subsection, which focuses primarily on facilities that maintain "'direct and ongoing contact with patients'" and provide "'shelter and sustenance in addition to medical treatment.'" 11 U.S.C. § 101(27A)(B); *see In re Banes*, 355 B.R. at 536 quoting *In re 7-Hills Radiology, Inc.*, 350 B.R. 902, 905 (Bankr D. Nev. 2006). While the list contained in subsection (B) is non-exhaustive, the nature of the businesses listed in the subsection all share the characteristic of providing treatment as well as temporary shelter, rendering the Debtor's dental practice unlikely to be categorized in the subsection. *See In re Banes*, 355 B.R. at 536 ("the types of businesses listed are all of such a similar nature in that they provide both housing and treatment, that it is difficult to imagine that the legislature would have intended a business that is so fundamentally different, such as an outpatient dental practice, to be read into the definition."); see also *In re Med. Assocs. of Pinellas*, L.L.C. 360 B.R. 356, 361 ("[…]the legislative history relating to efforts […] to amend the Bankruptcy Code to address patient care issues appears consistent with the concept that a health care business was intended to refer to inpatient care facilities such as hospitals and nursing homes and not most outpatient facilities such as a doctor's office.").

6.     Here, the Debtor's dental practice provides only outpatient services, and does not provide shelter and sustenance to its patients, and thus it cannot be considered a healthcare

3

business. *See Id.* (finding a Debtor's dental practice was "plainly not within the range of health care businesses" anticipated by section 101(27A) because it "does not provide patients with shelter and sustenance in addition to medical treatment.").

II. **A PCO IS NOT WARRANTED BECAUSE THERE IS NO INDICATION THAT PATIENT CARE OR PRIVACY IS AT ISSUE**

7. Even if the Debtor were considered a healthcare business within the definition of section 101(27A) of the Bankruptcy Code, which the Debtor does not concede, there are no circumstances which warrant the appointment of a PCO. Section 333(a)(1) of the Bankruptcy Code provides, in relevant part:

> If the debtor […] is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business **unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case**.

11 U.S.C. § 333(a)(1) (emphasis added). As such, the plain language of the statute permits the Court, in its discretion, to determine if in fact a PCO is warranted. *See In re North Shore Hematology-Oncology Assoc., P.C.* 400 B.R. 7, 11-12 (Bankr. E.D.N.Y. 2008) *citing In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008).

8. To determine whether it is necessary to appoint a PCO, courts typically consider the following factors, first articulated by the bankruptcy court in *In re Alternate Family Care*:

> (1) the cause of the bankruptcy; (2) the presence and role of licensing or supervising entities; (3) debtor's past history of patient care; (4) the ability of the patients to protect their rights; (5) the level of dependency of the patients on the facility; (6) the likelihood of tension between the interests of the patients and the debtor; (7) the potential injury to the patients if the debtor drastically reduced its level of patient care; (8) the presence and sufficiency of internal safeguards to ensure appropriate level of care; (9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization.

4

*In re Alternate Family Care*, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007); *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7, 11 (Bankr. E.D.N.Y. 2008); 3 *Collier on Bankruptcy* ¶ 333.02[2] (16th ed.).

9. The weight given to each of the above nine factors is at the discretion of the bankruptcy court. *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. at 11. Other factors courts have considered are: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant. *Id. citing In re Valley Health Sys.*, 381 B.R. at 762.

10. Some courts that have declined to appoint a PCO have done so in cases with similar facts to those present here, including where a debtor has no history of providing deficient patient care; does not provide inpatient care; has filed bankruptcy for reasons not related to deficient patient care, and; where appointing a PCO would adversely affect the debtor's ability to reorganize. *See* e.g., *In re North Short Hematology-Oncology Associates, P.C.,* 400 B.R. at 12; *In re Mississippi Maternal-Fetal Medicine, P.A.,* 2021 WL 1941627, *3-4 (Bankr. S.D. Miss. 2021); *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689; *see also In re Valley Health Sys.*, 381 B.R. at 764; *see also In re Saber*, 369 B.R. at 638. Here, as set forth below, the analysis of the nine-factor test weighs heavily in favor of a finding that a PCO is not necessary in the Debtor's case.

*Factor (1): the cause of the bankruptcy.*

11. The first factor of the *Alternate Family Care* test, "the cause of the bankruptcy,"

5

weighs against appointing a PCO because the Debtor's bankruptcy filing is not related to deficient patient care. *See generally* Local Rule 1007-2 Declaration of Dr. Sameh Aknouk, DDS, ECF No. 2 (the "**1007 Dec**."); *In re Alternate Family Care*, 377 B.R. at 758. Rather, the Debtor's bankruptcy is a result of liability in relation to the Debtor's alleged failure to remit employer contributions for part-time employees, which includes backpay, expenses, excess tax liability and fund contributions. *See* 1007 Dec. at ¶¶ 6, 9. While this triggering event does indicate that the Debtor lacked the funds to satisfy this liability, there is no indication that there has been any reduction in patient care or privacy for any reason whatsoever, including financial. *See generally Aknouk Declaration,*; See *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (finding affiliated dental clinic debtors satisfied the burden to show a PCO was not necessary in large part because the bankruptcy was caused by "cash flow problems resulting from changes to Medicare reimbursement practices for orthodontics."); *In re Saber*, 369 B.R. at 637 (finding that a PCO was not necessary where the bankruptcy was precipitated by the entry of a state court judgment in relation to a contractual employment dispute rather than patient care); *In re Total Women Healthcare Center, P.C.*, 2006 WL 3708164 (Bankr. M.D. Ga. 2006) (finding a PCO not necessary where the Debtor's obligations in bankruptcy arose from tax liability rather than deficient patient care).

12. Thus, factor (1) weighs against appointing a PCO.

*Factor 2: the presence and role of licensing or supervising entities.*

13. Both the Debtor, as a practice, and the dentists, as licensed professionals, are monitored by State regulatory and licensing agencies. See *Aknouk Declaration,* Sec. II. The Debtor is inspected regularly by New York State and the dentists complete continuing education to ensure that they are up to date on the latest skills, treatments, techniques and developments in the industry.

6

*Id.* The presence and role of these licensing agencies weighs against appointing a PCO. *See In re Alternate Family Care*, 377 B.R. at 758; *In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (up-to-date licenses and insurance coverage in accordance with state requirements weigh against the appointment of a PCO).

14. Thus, factor (2) weighs against appointing a PCO.

***Factors (3) & (4): The Debtor's past history of patient care; the ability of patients to protect their rights.***

15. The Debtor has no history of compromised patient care or rights. See *Aknouk Declaration,* generally. The Debtor has operated for 25 years in good standing and Dr. Aknouk, its principal for over 30 years. *Id.* at ¶4. There have been no malpractice suits filed against the Debtor or its dentists and no complaints relating to deficient patient care. *Id.* at ¶¶7, 11. The Debtor's patients are fully informed about their treatment plan and their rights and have avenues both within and without the Debtor's organization to voice questions or concerns if any exist. *Id.* at Sec. IV.

16. Thus, factors (3) and (4) weigh against appointing a PCO.

***Factor 5: the patients' level of dependency on the Debtor.***

17. The fifth factor is largely inapplicable to the Debtor given that the Debtor is entirely an outpatient facility. As such, there is little dependency on the Debtor by its patients in the way factor 5 implies. *See In re Mississippi Maternal-Fetal Medicine, P.A.*, 2021 WL 1941627 (Bankr. S.D. Miss. 2021) ("The risk to patient care is lessened further by the Debtor's role in only providing outpatient care instead of a continuity of day-to-day care."); *see also In re Genesis Hospice Care LLC*, *No.*, 2009 WL 467265, at *2 (Bankr. N.D. Miss. Feb. 24, 2009) (stating the need for a PCO is lessened where a debtor provides only outpatient care); *In re*

*North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7, 12 (Bankr. E.D.N.Y. 2008) (stating "[t]he fact that Debtor does not provide any inpatient services at any of its facilities holds substantial significance in this Court's decision."); *see also In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (finding a low level of provider dependency where dental patients have access to their medical records and the nature of a dental clinic is such that a patient may "seek alternate dental or orthodontic care" if he or she so chooses).

18.     Thus, factor (5), to the extent that it is applicable, weighs against appointing a PCO.

*Factors (6) & (7): the likelihood of tension between the interests of the patients and the Debtor; the potential injury to the patients if the Debtor drastically reduced its level of patient care.*

19.     There is a low likelihood of tension between the interests of the patients and the Debtor because the Debtor did not file bankruptcy as a result of deficient patient care or the ability to pay vendors and suppliers who are critical to patient care. *See In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (stating "[b]ecause malpractice does not appear to have caused the bankruptcy, no likelihood of tension between the interests of the patients and Debtors appears to exist."); *In re Alternate Family Care*, 377 B.R. at 758.

20.     Factor (7) asks courts to consider the potential injury to the patients if the debtor drastically reduced its level of patient care. *In re Alternate Family Care*, 377 B.R. at 758. Courts typically find this factor to weigh in favor of appointing a PCO where the Debtor is a long-term care facility or hospital that performs a high volume of inpatient procedures. *See In re Valley Health Sys.*, 381 B.R. at 764 (court found that factor (7) weighed in favor of appointing a PCO due to the nature of the Debtor's services, including inpatient surgeries, critical care, and specialized eye surgery; and the fact that a "cessation of operations at one of the Debtor's hospitals would require a transfer of patients to another facility.") Here, the Debtor provides dental services that

8

involve only local anesthesia on occasion, require little to no recovery time for patients, and do not require patients to remain at the clinic overnight or even for extended periods of time for observation. Therefore, if the Debtor were to reduce its patient care drastically, it would not have the requisite effect needed to sway this factor in favor of appointing a PCO.

21. Thus, factors (6) and (7) weigh against appointing a PCO.

***Factor (8): the presence and sufficiency of internal safeguards to ensure appropriate level of care.***

22. As set forth in detail in the Aknouk Declaration, the Debtor has sufficient internal mechanisms in place to monitor patient care and resolve complaints. The Debtor is certified in Emergency Care and Safety and maintains the number of continuing education credits required by New York State. See *Aknouk Dec.,* Sec. II. The Debtor's x-ray machines are inspected by the Department of Health and Dental Hygiene every three years, and the Debtor provides a led shield to patients using the x-ray machine. *Id.* To ensure cleanliness, the Debtor uses an air purifier; an ultraviolet light to sterilize the room and dental tools; and dentists and assistants use gloves, masks, shields, and disposable coats *Id.* at Sec. III.

23. To resolve a complaint, a patient may call the dentists or office manager, and explain any issues it may have experienced before, during, or after its dental visit. Because there are multiple individuals at the Debtor who can address these issues, in addition to the State agencies who oversee and license the Debtor, there are ample avenues available to ensure that any complaint is adequately investigated and resolved. *See In re Smiley Dental Arlington PLCC*, 503 B.R. at 689 (stating that internal safeguards were sufficient where the Debtors' dentists worked in teams, which "provide[d] a form of internal oversight and safeguard for patient care.").

24. Thus, factor (8) weighs against appointing a PCO.

*Factor (9): the impact of the cost of an ombudsman on the likelihood of a successful reorganization.*

25.  The Debtor is a small business, and as such, its cash flow is often strained. This strain is exacerbated by the Chapter 11 which carries with it its own administrative costs, modest though they may be, which are unavoidable including counsel and Subchapter V Trustee. What available disposable income the Debtor has should be allocated to the Debtor's creditors on account of their allowed claims, as opposed to the costs associated with an ombudsman whose services, in this case and at this time, are not warranted. *See In re Saber*, 369 B.R. at 638 (stating that, in a case with a Debtor who operated a small business, "although no testimony was elicited regarding the potential expenses associated with the appointment of a patient care ombudsman, the Court is concerned the costs involved […] could preclude this Debtor from reorganizing […].").

26.  Thus, factor (9) weighs against appointing a PCO.

III.    CONCLUSION

27.  For the reasons set forth herein as well as those detailed in the Aknouk Declaration, the Debtor submits that the appointment of a PCO is not warranted in this case. There is no evidence to suggest that patient care and/ or patient privacy are at risk. To the extent that circumstances should chance in the future, the Court can always reexamine the appropriateness of an appointment. However, at present, the Debtor is operating in a responsible, effective and compliant manner and should be given every opportunity to preserve its precious resources so that they can be utilized in connection with a successful reorganization and emergence from Chapter 11.

10

**WHEREFORE,** the Debtor respectfully requests that the Court deny the Motion, together with such other and further relief as is just and proper under the circumstances.

Dated: Scarsdale, New York
February 9, 2023

                      KIRBY AISNER & CURLEY LLP
                      *Attorneys for the Debtor*
                      700 Post Road, Suite 237
                      Scarsdale, New York 10583
                      Tel: (914) 401-9500

                      By: */s/ Erica R. Aisner*
                            Erica R. Aisner, Esq.