UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:                                                                                   FOR PUBLICATION

   SAMEH H. AKNOUK, DENTAL SERVICES, P.C.,            Chapter 11

                                                     Debtor.            Case No. 22-11651 (MG)
------------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING THE UNITED STATES
TRUSTEE'S MOTION FOR APPOINTMENT OF A PATIENT CARE OMBUDSMAN
<u>UNDER 11 U.S.C. §§ 101(27A) AND 333</u>**

*A P P E A R A N C E S:*

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
By:    Erica R. Aisner, Esq.


OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
By:    Shannon Anne Scott, Esq.


**MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE**

       Pending before the Court is the motion of the United States Trustee ("US Trustee") for appointment of a patient care ombudsman in this Subchapter V, Chapter 11 case. ("Motion," ECF Doc. # 33.) The debtor, Sameh H. Aknouk Dental Services, P.C. ("Debtor") filed an objection to the Motion. ("Objection," ECF Doc. # 38.) A hearing was held on the Motion on February 16, 2023. The Motion raises the important question whether the Court should deny the Motion for appointment of an ombudsman in an SBRA case where adding administrative

expense may make it considerably more difficult for the Debtor successfully to restructure and no issues relating to patient care have arisen.

For the reasons explained below, the Court **SUSTAINS** the Debtor's Objection and **DENIES** the Motion **WITHOUT PREJUDICE**.

## I.     BACKGROUND

The US Trustee filed the Motion pursuant to section 333(a)(1) of the Bankruptcy Code (the "Code"), which requires the Court to order the appointment of an ombudsman to monitor the quality of patient care (a "Patient Care Ombudsman") where the debtor is a health care business, as defined by section 101(27A), filing for chapter 7, 9, or 11 relief, unless the Court finds that such appointment is not necessary for the protection of patients. *See* 11 U.S.C. § 333(a)(1). The Debtor did not affirmatively acknowledge that it is a health care business in its voluntary petition. (Motion at 1; *see also* "Petition," ECF Doc. # 1, at 2.) According to the declaration of Dr. Sameh H. Aknouk annexed to the Debtor's Objection ("Aknouk Declaration," ECF Doc. # 38-1) and Dr. Sameh Aknouk's Section 341 Meeting testimony cited in the Declaration of Shannon Anne Scott annexed to the Motion ("Scott Declaration," ECF Doc. # 33-1), the Debtor is a family owned and operated full-service general and cosmetic dentistry practice which has been in operation for approximately twenty-five years and services between 1,000 and 2,000 patients. (Aknouk Declaration ¶ 2; Scott Declaration ¶ 4.) The Debtor currently operates as a debtor-in-possession and manages patient record keeping using a software program called "Dentrix." (Motion at 2.)

The Debtor initiated bankruptcy proceedings due to mounting legal costs stemming from a labor dispute in conjunction with declining revenues due to the COVID-19 pandemic. (Aknouk Declaration ¶ 6.) According to the Debtor's declaration filed pursuant to Local Rule

2

1007-2 ("Rule 1007-2 Declaration," ECF Doc. # 2), the Debtor had a collective bargaining agreement (the "CBA"), now terminated, with Local 553, International Brotherhood of Teamsters (the "Union") at the time Dr. Aknouk began operating the dental practice, which the Debtor renewed several times over the years. (Rule 1007-2 Declaration ¶ 4.) The Debtor claims it was the Debtor's understanding that only full-time employees were eligible for certain benefits under the CBA. (*Id.*) The Union's audit firm conducted regular audits of the Debtor's payroll records to confirm proper reporting to the Union, and, following the audit firm's 2018 payroll audit, the Union demanded approximately $98,378.30 for unpaid benefits to part-time employees. (*Id.* ¶¶ 5–7.)

The Union commenced an action in the United States District Court for the Eastern District of New York on August 24, 2018 (the "District Court Action") seeking to recover allegedly delinquent contributions plus 18% interest and attorneys' fees. (*Id.* ¶ 8.) In February 2021, the National Labor Relations Board investigated the Union's claims and sought recovery from the Debtor of $232,139 (the "NLRB Action"), which the Debtor believes would need to be paid in addition to any judgment or settlement arising out of the District Court Action. (*Id.* ¶ 9.) The Debtor failed to file an answer in the NLRB Action by the deadline, which was sometime in November 2022, although Debtor does not provide an exact date. The NLRB subsequently moved for entry of a default judgment. (*Id.*) The Debtor denies that it has any liability to the Union but seeks Chapter 11 bankruptcy protections in order to restructure its affairs. (*Id.* ¶ 10–11.)

### A. The Debtor's Status as a Health Care Business

The US Trustee claims that the Debtor is a health care business within the meaning of section 101(27A) despite the Debtor not identifying itself as such in its voluntary petition.

3

(Motion at 7–9.) The US Trustee relies on information presented on the Debtor's website as well as Dr. Aknouk's testimony to argue that the Debtor offers surgical treatments to the general public at its facilities. (*Id.*) Specifically, the US Trustee notes that the Debtor's website advertises dental procedures including root canals, crowns, tooth extraction, and dental implants to the general public and that Dr. Aknouk testified to administering local anesthesia to patients for such procedures. (*Id.* at 8.) The Debtor objects to the US Trustee's claim that it is a health care business within the meaning of section 101(27A) on the grounds that it does not provide inpatient services and is therefore not the type of business described in section 101(27A)(B). (Objection ¶¶ 5–6.)

### B. The Necessity of a Patient Care Ombudsman

The US Trustee states that a Patient Care Ombudsman is necessary because the Debtor's record keeping software, Dentrix, does not provide any oversight or monitoring of the quality of Debtor's patient services. (Motion at 2.) The US Trustee argues that such oversight is required because a decline in the quality of patient care could reduce the Debtor's income, which is essential to funding the Debtor's reorganization efforts. (*Id.* at 10.) The US Trustee further claims that the cost of appointing an ombudsman would not render it unnecessary because Debtor has sufficient cash on hand and a busy practice and because industry-wide revenues have substantially recovered to pre-pandemic levels. (*Id.* at 10–11.) The Debtor objects to the US Trustee's claim that a Patient Care Ombudsman is necessary even if it were properly classified as a health care business because, among other reasons, the cause of its bankruptcy is unrelated to patient care quality, it is subject to licensing and supervising authorities, and it has no prior history of deficient patient care. (Objection ¶¶ 7–16.) At a hearing in this matter on January 4, 2023, counsel for the Debtor indicated that the parties had tried to reach a compromise whereby

the subchapter V trustee, Yann Geron, (the "Subchapter V Trustee") would serve as the Patient Care Ombudsman, but Debtor's counsel indicated that proposal had not been acceptable to the US Trustee.

## II. LEGAL STANDARD

Section 333(a)(1) of the Code provides:

> (a)(1) If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business *unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case*.

11 U.S.C. § 333(a)(1) (emphasis added).

Compensation and reimbursement of an ombudsman is allowable as an administrative expense pursuant to section 503(b)(2) of the Code. 11 U.S.C. § 503(b)(2). The last italicized clause permits the Court to deny the motion for appointment of an ombudsman if it is "not necessary for the protection of patients under the specific facts of the case." Thus, the Court must decide whether the facts in this case make the appointment unnecessary.

### A. The Debtor's Status as a Health Care Business

The definition of a "health care business" is defined in 11 U.S.C. § 101(27A) as follows:

> (27A) the term 'health care business' —
>     (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for —
>         (i) the diagnosis or treatment of injury, deformity or disease; and
>         (ii) surgical, drug treatment, psychiatric, or obstetric care; and
>     (B) includes-
>         (i) any-
>             (I) general or specialized hospital;
>             (II) ancillary ambulatory, emergency, or surgical treatment facility;
>             (III) hospice;

5

>>(IV) home health agency; and other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and
>(ii) any long-term care facility, including any-
>>(I) skilled nursing facility;
>>(II) intermediate care facility;
>>(III) assisted living center;
>>(IV) home for the aged;
>>(V) domiciliary care facility; and
>>(VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

11 U.S.C. § 101(27A).

Courts determine whether a debtor is a health care business under section 101(27A) by applying a four-part test (the "*Pinellas* test" or "*Pinellas* elements"):

> The leading case on § 101(27A)(A) is *In re Medical Assc. Of Pinellas, LLC* . . . [which held that] (1) the debtor must be a private or public entity; (2) the debtor must be primarily engaged in offering to the general public facilities and services; (3) the facilities and services must be for the diagnosis or treatment of injury, deformity or disease; and (4) the facilities must be for surgical care, drug treatment, psychiatric care or obstetric care.

*In re Alternate Family Care,* 377 B.R. 754, 757 (Bankr. S.D. Fla. 2007) (citing *In re Med. Assocs. of Pinellas, LLC*, 360 B.R. 356, 359 (Bank. M.D. Fla. 2007)).

Courts are divided over the existence of an implicit fifth factor—whether a business is an inpatient facility. The debate hinges on whether the statute requires the Debtor to meet the requirements of subsections A *and* B of section 101(27A), which would require the Debtor to be both a medical provider and an inpatient provider, or only subsection A, which would not require the debtor to be an inpatient provider. *Contrast, e.g., In re Anne C. Banes, D.D.S., P.L.L.C.*, 355 B.R. 532, 534-35 (Bankr. M.D.N.C. 2006) (finding that a debtor's dental practice was not a health care business because it did not "provide patients with shelter and sustenance in addition to medical treatment" or "fit within the categories of health care businesses described in" section

6

101(27A)(B)) (citing *In re 7-Hills Radiology, LLC*, 350 B.R. 902, 904 (Bankr. D. Nev. 2006))

with *In re Smiley Dental Arlington, P.C.*, 503 B.R. 680, 687 (Bankr. N.D. Tex. 2013)

("Requiring this judicially created element . . . misconstrues the statute. The language in section 101(27A)(B) is inclusive of the specific entities listed and other similar entities, but not exclusive of other business entities meeting the test under section 101(27A)(A).").

### B. The Necessity of a Patient Care Ombudsman

In determining whether a Patient Care Ombudsman is necessary under the specific facts of a case, courts have examined the following nine non-exclusive factors:

1. The cause of the bankruptcy;
2. The presence and role of licensing or supervising entities;
3. Debtor's past history of patient care;
4. The ability of the patients to protect their rights;
5. The level of dependency of the patients on the facility;
6. The likelihood of tension between the interests of the patients and the debtor;
7. The potential injury to the patients if the debtor drastically reduced its level of patient care;
8. The presence and sufficiency of internal safeguards to ensure appropriate level of care; and
9. The impact of the cost of an ombudsman on the likelihood of a successful reorganization.

*In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008); *Alternate Family Care,* 377 B.R. at 758.

> "Other factors to be considered by the court include: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant."

*Valley Health*, 381 B.R. at 761 (citing 3 COLLIER ON BANKRUPTCY P 333.02, at 333-4 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2007)).

Section 333 requires the appointment of a Patient Care Ombudsman unless a court finds such appointment is not necessary. 11 U.S.C. § 333. Debtors found to be health care businesses

7

bear the burden of establishing that the appointment of a Patient Care Ombudsman is not necessary. *See In re Starmark Clinics, LP*, 388 B.R. 729, 734 (Bankr. S.D. Tex. 2008) ("The text of Section 333(a)(1) of the Bankruptcy Code makes clear that the burden of demonstrating that appointment of an ombudsman is not necessary for the protection of patients is on any party opposing the appointment of an ombudsman.").

### III. DISCUSSION

In this case, the Court agrees with the US Trustee, and rejects the Debtor's argument— the Debtor qualifies as a health care business under section 333 of the Bankruptcy Code under the more reasonable disjunctive interpretation of section 101(27A). Nevertheless, the Court finds that a patient services ombudsman is not necessary here on the facts.

**A. Debtor is a Health Care Business**

Debtor qualifies as a health care business under the broader interpretation of section 101(27A), which is the more reasonable reading of the statute. Under the broader (disjunctive) interpretation of section 101(27A), the analysis requires merely that the Debtor meet the definition of subsection A, which tracks the original four *Pinellas* Elements. *See, e.g., Smiley Dental*, 503 B.R. at 685-86. The narrower (conjunctive) interpretation of section 101(27A) requires the Debtor meet the definition of subsection B as well, which contains an inpatient requirement. *See, e.g., Banes*, 355 B.R. at 534-35. For the reasons set forth in section III.A.2, *infra*, this Court declines to follow the narrower (conjunctive) interpretation of the statute.

1. The Debtor Meets All Four of the *Pinellas* Elements

The first factor of the *Pinellas* test, that the debtor is a public or private entity, "'includes almost every conceivable entity,' so the inquiry typically focuses on the last three elements." *In re William L. Saber, M.D., P.C.*, 369 B.R. 631, 636 (Bankr. D. Colo. 2007) (quoting *Pinellas*,

8

360 B.R. at 359). This is satisfied because Debtor here is undoubtedly a private entity. (*See* Rule 1007-2 Declaration ¶ 2.) The second factor, which requires the debtor to be primarily engaged in offering facilities and services to the general public, is met where patients can make appointments without the assistance of a referring physician. *Alternate Family Care*, 377 B.R. at 757. The fact that a debtor has a website through which prospective patients can make appointments is strong evidence that this second prong is satisfied. *Id.* ("[T]he very presence of the website suggests that [the debtor] has a public presence and with [a link to check availability of appointments] it is plausible to suggest that it is offering its services to the general public."). The second factor is satisfied here because Debtor operates a website that advertises various services patients can obtain at Debtor's facilities and encourages interested patients to call to book appointments. (Scott Declaration ¶¶ 2–3.)

The third *Pinellas* factor requires that a debtor's services or facilities be used for "treatment of injury, deformity or disease." *Pinellas*, 360 B.R. at 359; 11 U.S.C. § 101(27A). This prong is met where a debtor provides "medically supervised treatment, whether or not it involves pharmacological treatment" for patients' conditions but is not met if a debtor provides solely administrative or procurement services for medical care facilities. *Alternate Family Care*, 377 B.R. at 758; *see also Pinellas*, 360 B.R. at 360. The Debtor here meets this prong because it provides root canals, tooth extraction, dental implants, and treatment for sleep apnea, and administers local anesthesia to patients for some of these procedures. (Scott Declaration ¶¶ 2, 4.) Finally, the fourth *Pinellas* factor requires that "the services or facilities be used for surgical care, drug treatment, psychiatric care or obstetric care." *Alternate Family Care*, 377 B.R. at 758. Courts have held that minor surgeries performed with local anesthetics are sufficient to qualify a business as a facility providing surgical care because "the statute does not differentiate between

9

minor and major surgeries." *Saber*, 369 B.R. at 637. Debtor qualifies as a surgical facility under this factor because "Dr. Aknouk administers local anesthesia to patients for dental procedures such as root canals for the Debtor." (Scott Declaration ¶ 4.) In sum, the Debtor undeniably qualifies as a health care business under section 101(27A) per the *Pinellas* test.

### 2. The Court Will Not Read the Inpatient Requirement into the Statute

Courts applying the conjunctive interpretation of section 101(27A) typically require that the debtor offers inpatient services and provides "sustenance and shelter" to patients. *See, e.g., Banes*, 355 B.R. at 535 (quoting *In re 7-Hills Radiology, LLC*, 350 B.R. 902, 904 (Bankr. D. Nev. 2006)). The inpatient requirement was first enunciated in *In re 7-Hills Radiology, LLC*, in which the court held that subsections A and B of section 101(27A) should be read conjunctively and then applied the canon of *noscitur a sociis* to subsection B to find that only businesses providing "direct and ongoing contact with patients to the point of providing them shelter and sustenance in addition to medical treatment" qualified as health care businesses. 350 B.R. 902, 905 (Bankr. D. Nev. 2006). A later decision by another bankruptcy judge applied this analysis and held that "the types of businesses listed [in subsection B] are all of such a similar nature in that they provide both housing and treatment . . . that it is difficult to imagine that the legislature would have intended . . . an outpatient dental practice[] to be read into the statute." *Banes*, 355 B.R. at 535.

Other courts have declined to follow this requirement, mainly disagreeing with the *7-Hills Radiology* court's approach to statutory interpretation. *See, e.g., Smiley Dental*, 503 B.R. at 687-88. In *Smiley Dental*, the court analyzed the debtor, a dental practice, to determine if it was a health care business as defined by section 101(27A). *Id.* Although the court ultimately held that a Patient Care Ombudsman was unnecessary regardless whether the debtor was a health care

10

business, it reasoned that the debtor's provision of minor dental surgeries such as "root canals, wisdom tooth removal, and tooth extractions" was likely sufficient to qualify the debtor as a health care business under both possible constructions of section 101(27A) because it met all of the requirements of section 101(27A)(A) and was specifically enumerated in section 101(27A)(B)(i)(II) as a "surgical treatment facility." *Id.* The *Smiley Dental* court declined to read the "sustenance and shelter" requirement into section 101(27A) because it believed such a reading "misconstrue[d] the statute" and because several other courts had determined debtors to be health care businesses despite only providing outpatient services. *Id.* at 687 (collecting cases). The court further noted that "[t]he language in section 101(27A)(B) is inclusive of the specific entities listed and other similar entities, but not exclusive of other business entities meeting the test under section 101(27A)(A)." *See id.* (citing 11 U.S.C. § 102(3)) ("In this title ... 'includes' and 'including' are not limiting.").

This Court similarly declines to read an inpatient services requirement into the definition of a health care business in section 101(27A). As *Smiley Dental* correctly notes, to read in this limitation would inappropriately curtail the reach of the statute, when there is nothing in the text to indicate that the statute should be read conjunctively. Further, there is no need to turn to canons of construction such as *noscitur a sociis* to interpret the statute when a plain reading of its language reveals that the entity at issue (Debtor) is explicitly enumerated as an example in subsection B. 11 U.S.C. § 101(27A)(B)(i)(II) ("includes . . . any . . . ancillary . . . surgical treatment facility.") Here, as noted above, Debtor is a "surgical treatment facility" because it provides root canals; the Debtor therefore qualifies as a health care business under a plain reading of the statute and the Court need not turn to canons of interpretation to make that finding. *See, e.g.*, *Pfizer v. United States Dep't of Health and Human Servs.*, 42 F.4th 67, 73-77 (2d Cir.

2022) (noting that canons of construction such as *noscitur a sociis* are only necessary where the meaning of a term is ambiguous according to a plain reading of the statute).

Because the Debtor meets all the required elements of the *Pinellas* test and because a plain reading of section 101(27A) indicates there is no inpatient services requirement, the Debtor here qualifies as a health care business.

### B. A Patient Care Ombudsman is Not Necessary

Even though the Debtor is a health care business, the Debtor has met its burden of establishing that a Patient Care Ombudsman "is not necessary for the protection of patients under the specific facts of the case." 11 U.S.C. § 333(a)(1). Each of the factors enumerated in *Valley Health*, discussed in turn below, weigh against appointing a Patient Care Ombudsman.

1. <u>Factor 1: Cause of Bankruptcy</u>

This factor weighs against the appointment of a Patient Care Ombudsman because the cause of the bankruptcy was liability related to the Debtor's alleged failure to remit employer contributions to the Union, and not any patient care issues, such as a malpractice. While this triggering event does indicate that the Debtor lacked the funds to satisfy potential liability arising out of the labor dispute, there is no indication that there has been any reduction in patient care or privacy due to financial constraints or any other reason. *See Smiley Dental*, 503 B.R. at 689 (finding affiliated dental clinic debtors satisfied the burden to show a patient care ombudsman was not necessary in large part because the bankruptcy was caused by "cash flow problems resulting from changes to Medicare reimbursement practices for orthodontics.").

2. <u>Factor 2: The Presence and Role of Licensing</u>

The Debtor, as a dental practice, is monitored by state regulatory and licensing agencies. (*See* Aknouk Declaration ¶¶ 8–10.) Further, the dentists employed by the Debtor are also subject

12

to state licensing rules and regulations. (Objection ¶ 13.) The Debtor is inspected regularly by New York State and the dentists complete continuing education to ensure that they are up to date on the latest skills, treatments, techniques, and developments in the industry. (Aknouk Declaration ¶¶ 8–10.) The presence and role of these licensing agencies weighs against appointing a Patient Care Ombudsman. *See Alternate Family Care*, 377 B.R. at 758; *Smiley Dental*, 503 B.R. at 689 (up-to-date licenses and insurance coverage in accordance with state requirements weigh against the appointment of a Patient Care Ombudsman). Thus, this factor weights against appointing a Patient Care Ombudsman.

3. <u>Factors 3 and 4: The Debtor's History of Patient Care; the Ability of Patients to Protect Their Rights</u>

The Debtor has no history of compromised patient care or rights. The Debtor has operated for 25 years in good standing and Dr. Aknouk, its principle, has been in practice for 30 years. (Aknouk Declaration ¶ 4.) There have been no malpractice suits filed against the Debtor or its dentists and no complaints relating to deficient patient care. (*Id.* ¶¶ 7, 11.) The Debtor's patients are fully informed about their treatment plan and their rights and have avenues both within and outside the Debtor's organization to voice questions or concerns if any exist. (Objection ¶ 15.) At the hearing, the US Trustee argued that because the Debtor operates a large practice, reportedly between 1000 and 2000 patients, the possibility of a future complaint is high and additional oversight is needed. As an initial matter, the US Trustee cites no caselaw for the proposition that the size of the practice is a factor that weighs in favor of appointing a Patient Care Ombudsman. (*See* Motion at 10.) Nevertheless, the Court agrees that as a practical matter, no party can guarantee that future patient complaints will not arise. Given that the Court here denies the Motion without prejudice, the US Trustee is free to bring a renewed motion should

patient care concerns arise in the future. Accordingly, these factors weigh against appointing a Patient Care Ombudsman.

    4.   Factor 5: The Patients Level of Dependency on the Debtor

Where, as here, a debtor is entirely an outpatient facility, courts have considered patients to be less dependent on the facility than they would be in an inpatient facility. *See, e.g., In re Miss. Maternal-Fetal Med., P.A.*, No. 21-0091-NPO, 2021 WL 1941627, at *3 (Bankr. S.D. Miss., Feb. 18, 2021) ("The risk to patient care is lessened further by the Debtor's role in only providing outpatient care instead of a continuity of day-to-day care."). Courts have also found a low level of dependency, where, as here, a debtor's services are easily found at numerous other dental offices. *See, e.g., Smiley Dental*, 503 B.R. at 689 (finding a low level of provider dependency where dental patients have access to their medical records and the nature of a dental clinic is such that a patient may "seek alternate dental or orthodontic care" if he or she so chooses). While patients who are under local anesthesia following a dental surgery are certainly dependent on the Debtor, there is no long-term dependency comparable to that of a hospital or other inpatient facility because such patients leave shortly after surgery. Accordingly, this factor weighs against appointing a Patient Care Ombudsman.

    5.   Factors 6 and 7: The Likelihood of Tension Between the Interests of the Patients and the Debtor; the Potential Injury to the Patients if the Debtor Drastically Reduced its Level of Patient Care

There is a low likelihood of tension between the interests of the patients and the Debtor because the Debtor did not file bankruptcy because of deficient patient care or an inability to pay vendors and suppliers who are critical to patient care. *See Smiley Dental*, 503 B.R. at 689 (stating that "[b]ecause malpractice does not appear to have caused the bankruptcy, no likelihood of tension between the interests of the patients and Debtors appears to exist").

As to the consequences of a drastic reduction in patient care, courts typically find this factor to weigh in favor of appointing a Patient Care Ombudsman where the Debtor is a long-term care facility or hospital that performs a high volume of inpatient procedures. *See, e.g., Valley Health*, 381 B.R. at 764 (finding that the seventh factor weighed in favor of appointing a Patient Care Ombudsman because the sensitive nature of the debtor's patient services, including inpatient surgery, critical care, and pediatric services, meant that "a drastic reduction in the quality of care [could] create[] a significant risk for patients" and because a "cessation of operations at one of the Debtor's hospitals would require a transfer of patients to another facility") For example, in *Alternate Family Care,* which involved an inpatient psychiatric facility for children, the court found this factor weighed in favor of appointing a Patient Care Ombudsman because a drastic reduction in the quality of the debtor's patient care services would require children to be moved to another facility, likely causing severe trauma and disruption. 377 B.R. at 760. Here, in contrast, the Debtor provides dental services that involve only local anesthesia on occasion and require little to no recovery time for patients in the clinic. (Objection ¶ 20.) If the level of Debtor's patient care became drastically reduced, it could certainly be harmful to patients, but patients could find another dentist to frequent without the attendant disruption that occurs when one is moved from one inpatient setting to another.

      6. <u>Factor 8: The Presence and Sufficiency of Internal Safeguards to Ensure Appropriate Level of Care</u>

As set forth in detail in the Aknouk Declaration, the Debtor has sufficient internal mechanisms in place to monitor patient care and resolve complaints. The Debtor is certified in Emergency Care and Safety and maintains the number of continuing education credits required by New York State. (*See* Aknouk Declaration ¶¶ 8–10.) The Debtor's x-ray machines are inspected by the Department of Health and Dental Hygiene every three years, and the Debtor

15

provides a lead shield to patients using the x-ray machine. (*Id.*) To ensure cleanliness, the Debtor uses an air purifier; an ultraviolet light to sterilize the room and dental tools; and dentists and assistants use gloves, masks, shields, and disposable coats. (*Id.* at ¶¶ 11–13.)

While the US Trustee argues that the Debtor's dental record system, Dentrix, provides no oversight of patient care (Motion at 2), the Debtor has explained that it has numerous checks and balances in place to ensure appropriate patient care. (*See* Objection ¶¶ 8–10; 14–15.) In addition to oversight from regulatory agencies, the Debtor has systems in place to process complaints or issues with care through its team of dentists and its office manager. (Objection ¶ 23); *see also Smiley Dental*, 503 B.R. at 689 (stating that internal safeguards were sufficient where the debtor's dentists worked in teams, which "provide[d] a form of internal oversight and safeguard for patient care").

Furthermore, though not articulated in the caselaw, the Court noted at the hearing, and reiterates here, that this case is a small business bankruptcy under Subchapter V of Chapter 11 with the Subchapter V Trustee appointed. The presence of such a trustee weighs against appointing a Patient Care Ombudsman. While a Subchapter V trustee does not provide the same level of oversight as a Patient Care Ombudsman would, and the Court can certainly imagine situations in which a Patient Care Ombudsman would be necessary in addition to a Subchapter V trustee, the Subchapter V trustee is an extra safeguard against patient care issues that gives the Court additional comfort that the Debtor's operations are being monitored. Thus, this factor weighs against appointing a Patient Care Ombudsman.

7. <u>Factor 9: the impact of the cost of an ombudsman on the likelihood of a successful reorganization</u>

The US Trustee argues that because the Debtor has approximately $25,000 on hand and does not anticipate needing a loan from the Debtor's principle, the cost of an ombudsman is not

16

an issue here. The Court disagrees. For the reporting month of January, the Debtor's monthly operating report shows that the Debtor was cash negative in the amount of $7,464.24. ("Operating Report," ECF Doc. # 41, at 3.) The Debtor does project that it will be cash flow positive in the amount of $9,995.29 next month. (*Id.*) However, the budget that the Debtor submitted as part of its cash collateral motion indicates that the Debtor will be very narrowly cash positive week to week, sometimes by under $1000 dollars. (*See generally* "Budget," ECF Doc. # 24.) In short, the margins here are thin and the Debtor does not have much room for additional administrative expenses, even if it does have a modest amount of cash on hand. The additional cost of a Patient Care Ombudsman could eat into these small margins and be the difference between a cash flow positive and negative business. Accordingly, this factor weighs against appointing a Patient Care Ombudsman.

## IV.    CONCLUSION

In sum, even though the Debtor is a health care business under the statute's meaning, because all of the *Valley Health* factors weigh against appointing a Patient Care Ombudsman, the Debtor has met its burden of establishing that a Patient Care Ombudsman is not necessary on the facts. Nevertheless, because the Court is cognizant that further patient care issues could arise and because the Court takes seriously the need to protect patient care during the pendency of the bankruptcy, the Motion is **DENIED WITHOUT PREJUDICE**. Should patient care issues arise in the future, the US Trustee may renew the motion.

Dated:    March 3, 2023
         New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge